# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| DERRICK CHUA, derivatively on behalf of DENTSPLY SIRONA INC., | Case No.: |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| SIMON D. CAMPION, GLENN G. COLEMAN, ANDREAS G. FRANK, GREGORY T. LUCIER, WILLIE A. DEESE, BRIAN T. GLADDEN, BETSY D. HOLDEN, CLYDE R. HOSEIN, JONATHAN J. MAZELSKY, LESLIE F. VARON, JANET S. VERGIS, DOROTHEA WENZEL, ERIC K. BRANDT, HARRY M. JANSEN KRAEMER JR., and JOHN P. GROETELAARS, | |
| Defendants, | |
| and | |
| DENTSPLY SIRONA INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Derrick Chua ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of Nominal Defendant Dentsply Sirona Inc. ("Dentsply" or the "Company"), brings this Verified Shareholder Derivative Complaint against Simon D. Campion ("Campion"), Glenn G. Coleman ("Coleman"), Andreas G. Frank ("Frank"), Gregory T. Lucier ("Lucier"), Willie A. Deese ("Deese"), Brian T. Gladden ("Gladden"), Betsy D. Holden ("Holden"), Clyde R. Hosein ("Hosein"), Jonathan J. Mazelsky ("Mazelsky"), Leslie F. Varon

("Varon"), Janet S. Vergis ("Vergis"), Dorothea Wenzel ("Wenzel"), Eric K. Brandt ("Brandt"), Harry M. Jansen Kraemer Jr. ("Kraemer"), and John P. Groetelaars ("Groetelaars") (collectively, the "Individual Defendants" and, together with Dentsply, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by Dentsply with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, filings in the securities class action captioned *In re Dentsply Sirona, Inc. Securities Litigation*, Case No. 1:24-cv-09083-NRB (S.D.N.Y) (the "Securities Class Action"), and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought against certain current and former Dentsply officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between December 1, 2022, and November 6, 2024, inclusive (the "Relevant Period.")

2.      Dentsply is the biggest manufacturer of professional dental products and technologies in the world and conducts business in over 120 countries. Dentsply supplies dental practitioners with a large variety of dental equipment products, ranging from high-tech imaging systems to tooth whiteners and topical fluoride.

3.      On December 31, 2020, Dentsply acquired Byte LLC ("Byte"), a company specializing in selling invisible aligners and related products for $1 billion. Dentsply described

2

Byte's business model as "built on doctor-directed care that provides excellent outcomes for patients with mild to moderate orthodontic needs." After the acquisition, Byte operated as a subsidiary of Dentsply.

4.　During the Relevant Period, Defendants made representations to investors that Byte was "very, very customer focused" and that Byte had "high" and "improving" customer satisfaction scores. Defendants also made representations that an "expansive nationwide network of independent licensed dentists and orthodontists" oversaw Byte customers to ensure compliance with dentistry rules and regulations. The Company also represented that it contained a "focused tunnel" of targeted potential customers, which would lead to a high rate of conversion to paying customers.

5.　In truth, Byte's invisible aligners have been causing major injuries to patients since at least May 2021. Byte did not have a system in place to report injuries to the Food and Drug Administration ("FDA"), despite being required to report such injuries within 30 days of learning of them. Furthermore, Byte's salespeople and overseeing dentists were incentivized to enroll "contraindicated" patients who were medically ineligible for Byte treatment, which inappropriately drove up conversion rates — a far cry from the "focused funnel" representations made to investors.

6.　The truth began to come out on October 24, 2024, when Dentsply announced that it was suspending the sale and marketing of Byte Aligner Systems and Impression Kits "while the Company conducts a review of certain regulatory requirements related to these products." On that day, Dentsply further announced that it expected to record a goodwill impairment of $450 to $550 million. As a result of those disclosures, Dentsply's common stock dropped $1.10 per share, or 4.5%.

3

7.      Then, on November 7, 2024, Dentsply adjusted its earnings per share ("EPS") outlook downwards by approximately 8%, due in part to the suspension of the sale of Byte products. The Company informed investors that it could not make a decision regarding Byte, but was considering discontinuing some or all of the Byte business. Dentsply also confirmed an impairment of $495 million related to Byte. In addition, Defendant Campion, Dentsply's Chief Executive Officer ("CEO") said that Byte was one of a few "significant hurdles" to achieving the Company's long-term EPS targets. These disclosures caused Dentsply common stock to drop $6.72 per share, or more than 28%.

8.      Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Dentsply to repurchase its own stock prices that were artificially inflated due to the foregoing misrepresentations. From March 2023 to September 2024, approximately 18.2 million shares of Dentsply common stock were repurchased at artificially inflated prices, which cost Dentsply approximately $551.4 million. As the Company's stock was worth only $17.26 per share, the price at which it was trading when the markets closed on November 7, 2024, the day the truth emerged, Dentsply overpaid over $237.3 million in repurchases of its own stock.

9.      The Individual Defendants' acts have caused Dentsply, Defendant Campion, Defendant Coleman, and Defendant Frank, to be named as defendants in the Securities Class Action.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff's claims asserted herein raise a federal question under Section and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), SEC Rule 14a-9

4

promulgated there 78j(b), 78t(a)under (17 C.F.R. § 240.14a-9), Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

12.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

14.     Plaintiff is a current shareholder of Dentsply and has continuously held Dentsply common stock at all relevant times.

15.      Nominal Defendant Dentsply is incorporated under the laws of Delaware and its principal executive offices are located at 13320 Ballantyne Corporate Place, Charlotte, North Carolina 28277-3607. The Company's common stock trades on Nasdaq under the symbol "XRAY."

16.     Defendant Campion has served as Dentsply's CEO, President and Director since September 2022. According to the proxy statement filed on Schedule 14A with the SEC on April 9, 2025 (the "2025 Proxy Statement"), in 2024, Defendant Campion received $8,683,952 in compensation from the Company.

17.     Defendant Coleman served as Dentsply's Chief Financial Officer ("CFO") and

5

Executive Vice President from September 2022 to November 7, 2024. According to the 2025 Proxy Statement, in 2024, Defendant Coleman received $3,135,099 in compensation from the Company.

18.     Defendant Frank served as Dentsply's Chief Business Officer ("CBO") and Executive Vice President from April 2022 to October 1, 2024. According to the 2025 Proxy Statement, in 2024, Defendant Frank received $3,528,370 in compensation from the Company.

19.     Defendant Lucier has served as a Company director since 2019. He has been Non-Executive Chairman of the Board since January 1, 2024. Defendant Lucier has also served as a member of the Corporate Governance and Nominating Committee since January 1, 2024. Before that, he was a member of the Human Resources Committee. According to the 2025 Proxy Statement, in 2024, Defendant Lucier received $495,000 in compensation from the Company.

20.     Defendant Deese has served as a Company director since 2011. Defendant Deese serves as Chair of the Human Resources Committee. According to the 2025 Proxy Statement, in 2024, Defendant Deese received $340,000 in compensation from the Company.

21.     Defendant Gladden has served as a Company director since January 1, 2024. He is a member of the Audit and Finance Committee. According to the 2025 Proxy Statement, in 2024, Defendant Gladden received $320,000 in compensation from the Company.

22.     Defendant Holden has served as a Company director since 2018. She is Chair of the Corporate Governance and Nominating Committee. According to the 2025 Proxy Statement, in 2024, Defendant Holden received $335,000 in compensation from the Company.

23.     Defendant Hosein has served as a Company director since 2020. He is a member of the Audit and Finance Committee as well as a member of the Science and Technology Committee. According to the 2025 Proxy Statement, in 2024, Defendant Hosein received $320,000 in compensation from the Company.

6

24.     Defendant Mazelsky has served as a Company director since May 2023. He is a member of the Human Resources Committee as well as a member of the Science and Technology Committee. According to the 2025 Proxy Statement, in 2024, Defendant Mazelsky received $320,000 in compensation from the Company.

25.     Defendant Varon has served as a Company director since 2018. She is the Chair of the Audit and Finance Committee. According to the 2025 Proxy Statement, in 2024, Defendant Varon received $345,000 in compensation from the Company.

26.     Defendant Vergis has served as a Company director since 2019. She is Chair of the Science and Technology Committee. She is also a member of the Human Resources Committee. According to the 2025 Proxy Statement, in 2024, Defendant Vergis received $335,000 in compensation from the Company.

27.     Defendant Wenzel served as a Company director from 2022 until February 5, 2025. She was a member of the Audit and Finance Committee. According to the 2025 Proxy Statement, in 2024, Defendant Wenzel received $320,000 in compensation from the Company.

28.     Defendant Brandt served as a Company director from 2004 until May 22, 2024. He was Non-Executive Chairman of the Board from September 28, 2017, through December 31, 2023. He was also a member of the Corporate Governance and Nominating Committee. According to the 2025 Proxy Statement, in 2024, Defendant Brandt received $25,000 in compensation from the Company. According to the proxy statement filed on Schedule 14A with the SEC on April 10, 2024, (the "2024 Proxy Statement"), in 2023, Defendant Brandt received $456,250 in compensation from the Company.

29.     Defendant Kraemer served as a Company director from 2004 until December 31, 2023. He served as a member of the Corporate Governance and Nominating Committee. According

7

to the 2024 Proxy Statement, in 2023, Defendant Kraemer received $300,000 in compensation from the Company.

30.     Defendant Groetelaars served as a Company director from April 2022 until May 24, 2023. According to the 2024 Proxy Statement, in 2023, Defendant Groetelaars received $25,000 in compensation from the Company.

31.     Non-party Director Michael J. Barber ("Barber") has served as a member of the Board since February 5, 2025. Barber is named herein solely for the purposes of demand futility. Barber serves as a member of the Science and Technology Committee. Barber participates in the same compensation plans as the other non-employee members of the Board.

32.     Non-party Director Daniel T. Scavilla ("Scavilla") has served as a member of the Board since February 5, 2025. Scavilla is named herein solely for the purposes of demand futility. Scavilla serves as a member of the Audit and Finance Committee. Scavilla participates in the same compensation plans as the other non-employee members of the Board.

33.     Non-party Director Donald J. Zurbay ("Zurbay") has served as a member of the Board since January 10, 2026. Zurbay is named herein solely for the purposes of demand futility. Zurbay serves as a member of the Audit and finance Committee. Zurbay participates in the same compensation plans as the other non-employee members of the Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

34.     By reason of their positions as officers, directors, and/or fiduciaries of Dentsply and because of their ability to control the business and corporate affairs of Dentsply, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are

required to act in furtherance of the best interests of the Company and its shareholders.

35.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

36.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

37.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

9

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

38.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a

10

reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

39.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

40.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

41.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

42.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Dentsply, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual

11

or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

44.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Dentsply and at all times acted within the course and scope of such agency.

## THE CODE OF ETHICS & BUSINESS CONDUCT

45.     Dentsply maintains a Code of Ethics & Business Conduct (the "Code of Conduct"), which states in relevant part:

> Dentsply Sirona has a renewed sense of commitment to an unwavering focus on performance with integrity. As we continue to grow, we rely on the integrity of every **employee, board member and business partner** to guide their actions. However, it is not enough to just act with integrity, we must hold each other accountable and be willing to speak up if we see something that does not align with our values and operating principles. **We must be honest in our communication – transparent in our intentions and forthcoming with all information that will help the company make good decisions and operate in a compliant manner.**
>
> ***
>
> As members of the Dentsply Sirona community, we are accountable to one another. Should you ever have questions or concerns about the policies outlined in the Dentsply Sirona Code or the integrity of others' actions, please alert your manager, your local compliance leader, the Chief Compliance Officer, or use one of the many other channels the Company makes available to you including the Ethics Hotline. **Do not allow anything – such as "making the numbers," competitive instincts, or even a direct order from a superior – to compromise your commitment to unquestionable integrity.**
>
> ***
>
> **Excellent financial performance and high standards of governance and compliance are equally important and valuable.** As we continually improve upon Dentsply Sirona's business, we must recognize that only one kind of performance will maintain our strong reputation, increase our customers' confidence in our products and services, and enable us to continue to grow. . .

(Emphasis added.)

46.     In a section titled "What Leaders Must Do", the Code of Conduct provides the

following, in relevant part:

Ethical business practices and compliance with all applicable laws is everyone's responsibility. It starts with our values and must be reflected in all of our actions. The tone from the top is important in creating a foundation for a culture of integrity but leaders at all levels must live those values and demonstrate unwavering integrity in everything we do.

As a leader, you must act to cultivate this culture of compliance in your respective organizations and assure that your employees understand their responsibilities and feel comfortable raising concerns without fear of retaliation. This means encouraging ethical conduct and compliance with the law by personally demonstrating and promoting Dentsply Sirona's Core Values, considering compliance efforts when evaluating and rewarding employees, and ensuring that employees understand that business results must be achieved while complying with Dentsply Sirona policies and all applicable laws.

It is the responsibility of our pillar leadership (Product Groups, RCO's, Supply Chain and Corporate Functions) at all levels to assure that the various polices and processes which constitute the Dentsply Sirona Ethics and Compliance program are fully and effectively administered in their respective areas of responsibility. The Ethics and Compliance department is always available to answer questions and provide guidance to our global businesses.

All managers must take the following steps to build an infrastructure to prevent, detect and respond to compliance issues:

- Ensure that policies and processes, tailored to address your particular risk areas, are communicated and implemented.

- Ensure that all employees receive education on Dentsply Sirona policies and applicable law.

- Commit adequate resources to your business efforts toward implementing the compliance program.

- Include ethics and compliance topics in your staff meetings and townhalls. The Compliance staff should not be the only leaders talking about ethics and compliance.

13

- Implement control measures, such as appropriate financial controls to identify and prevent fraud and other violations.

- Promote Dentsply Sirona's Core Values and Operating Principles and the Dentsply Sirona Code of Ethics and Business Conduct.

- Support and encourage periodic compliance reviews with the assistance of the Chief Compliance Officer or your regional Compliance Leader, and/or the Corporate Internal Audit Services staff.

- Encourage employees to speak up and report integrity or compliance issues.

- Promptly implement corrective action to fix identified compliance weaknesses.

- Report any legal and ethics issues to the Legal department and/or Chief Compliance Officer.

In addition, the Chief Executive Officer (CEO), Chief Financial Officer (CFO), and Chief Accounting Officer (CAO) or persons performing similar functions, are subject to the following additional specific requirements:

- Maintain high standards of honest and ethical conduct and avoid any actual or apparent conflict of interest;
- report to the Audit and Finance Committee of the Board of Directors any conflict of interest that may arise and any material transaction or relationship that reasonably could be expected to give rise to a conflict;

- **provide, or cause to be provided, full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in other public communications**;

- **comply and take all reasonable actions to cause others to comply with applicable governmental laws, rules, and regulations**; and

- promptly report violations of the Code of Ethics for the CEO, CFO, and CAO to the Audit and Finance Committee either through the DS Ethics Hotline or directly to the chair of the Audit and Finance Committee.

- [T]he Audit and Finance Committee will in-turn assess compliance with this Code of Ethics for material violations to the Board of Directors and recommend to the Board appropriate action.

14

(Emphasis added.)

## THE AUDIT COMMITTEE CHARTER

47.　　The Company also maintains an Audit and Finance Committee Charter (the "Charter"), which states:

> The purpose of the Audit and Finance Committee (the "Committee") is to assist the Board of Directors (the "Board") of DENTSPLY SIRONA Inc. (the "Company") in its oversight responsibilities related to corporate accounting and financial reporting disclosures, systems of internal accounting and financial controls of the Company and the audit of the Company's financial statements, the implementation and effectiveness of the Company's disclosure controls and procedures, corporate financing activities, treasury activities, information technology and cyber security activities, internal audit activities, risk management activities relating to financial and other matters, including corruption and bribery laws (e.g., the FCPA and the UK Bribery Act), and the Company's process for monitoring compliance with laws and regulations and the Company's Code of Business Conduct and Ethics. The Committee shall also prepare the report of the Committee required to be included in the Company's annual proxy statement. It shall be the policy of the Committee to maintain free and open communication between the Board, the registered public accounting firm engaged for the purpose of preparing or issuing an audit report for inclusion in the Company's annual report on Form 10-K or for performing other audit, review or attest services for the Company (referred to herein as the "independent accountants"), the internal auditors and the management of the Company.

48.　　In a section titled "Financial Oversight and Reporting", the Charter states that the Audit and Finance Committee has the authority and responsibility to do the following, in relevant part:

> 1. To have the sole authority to select, retain and terminate the Company's independent accountants, including approval of an engagement letter. The Committee shall consider the most recent vote of the Company's stockholders with respect to the retention of independent public accountants, provided that such vote shall not be binding and the Committee shall retain full discretion and authority with respect to the selection, retention and termination of the Company's independent accountants. The Committee shall be directly responsible for the appointment, compensation and oversight of the work of the independent accountants (including resolution of disagreements between management and the independent accountants regarding financial reporting) for the purpose of preparing

15

or issuing an audit report or performing other audit, review or attest services for the Company. The independent accountants shall report directly to the Committee.

***

2. To review and discuss with management, internal audit and the independent accountants, in separate meetings if the Committee deems it appropriate:

(g)     the annual audited financial statements, related footnotes and other financial information to be included in the Company's Form 10-K, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), prior to the filing of the Form 10-K and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K;

(h)     the quarterly financial statements, related footnotes and other financial information to be included in the Company's Form 10-Q, including the Company's disclosures under MD&A, prior to the filing of the Company's Form 10-Q;

(i)     any major issues regarding significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes to the Company's internal control over financial reporting or to the Company's selection or application of accounting principles and major issues as to the adequacy of the Company's internal control over financial reporting and any special audit steps adopted in light of material control deficiencies;

(j)     analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

(k)     the effect of regulatory and accounting initiatives on the Company's financial statements as well as off-balance sheet structures, if any;

(l)     disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K or Form 10-Q regarding any significant deficiencies in the design or operation of internal control over financial reporting or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting;

(m)     significant, complex or unusual transactions and their impact on the financial statements;

16

(n)     any material communications between the Company and the SEC, particularly those relating to financial reporting matters; and

(o)     risk of fraud (regardless of materiality) and the implementation and existence of fraud control.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

***Materially False and Misleading Statements Issued During the Relevant Period***

49.     The Relevant Period begins on December 1, 2022, during the Evercore ISI HealthCONx Conference, when Defendant Campion praised Byte, stating, "[W]e think that Byte can be an integral and important part of our portfolio moving forward. . . . [A]s we move into 2023, it is a key focus for management and the team that runs Byte and SureSmile to ensure we get more value out of that particular part of our business."

50.     During the same conference, Defendant Coleman added, "I think we've seen really strong sequential growth in different parts of our aligner business both Byte and SureSmile year-over- year. . . . I think the key for us, though, is – the revenue opportunity is clearly there. . . . But [Defendant Campion's] point, it is an underpenetrated market, probably the fastest-growing area of dental as we know. And so our intent is to continue to be a key player here."

51.     On January 11, 2023, several Dentsply executives attended the J.P. Morgan Healthcare Conference. During the conference, Defendant Frank talked about "patient compliance and patient experience," stating "our new Byte app [] drives significantly closer engagement with the patients throughout their treatment, leads to higher compliance, leads to higher net promoter scores that we can track and measure as one of our KPIs."

52.     On February 28, 2023, Dentsply conducted an earnings call with investors and analysts to talk about the Company's financial results for the fourth quarter of 2022. During the call, Defendant Coleman claimed that "despite slowing consumer spending trends," Byte saw

strong growth due to "improvement in customer conversion rates." Defendant Campion portrayed Byte as "a meaningful part of our portfolio" and that Dentsply was focusing on "driving customer acquisition, customer conversion and trying to increase customer satisfaction scores."

53.     On March 1, 2023, Dentsply filed an annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Campion, Coleman, Brandt, Deese, Groetelaars, Holden, Hosein, Kraemer, Lucier, Varon, Vergis, and Wenzel. Appended to the 2022 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Campion and Coleman, attesting to the accuracy of the financial statements contained therein.

54.     The 2022 10-K reiterated that Byte "contracts with an expansive nationwide network of independent licensed dentists and orthodontists for the provision of clinical services, including the oversight and control of each customer's clinical treatment in order to comply with these regulations and ensure that the business does not violate rules pertaining to the corporate practice of dentistry."

55.     On May 3, 2023, Dentsply conducted its earnings call for the first quarter of 2023. During this call, Defendant Coleman claimed that "higher customer conversion rates" were driving "strong growth" for Byte, "despite slowing consumer spending trends." Coleman added, "the most important thing is really looking at the quality of the funnel and how we're targeting customers. And we're seeing an increase in our overall customer conversion rates, which really helped to reduce customer acquisition costs and drive increased profitability." He then stated, "I think we're doing a much better job at targeting customers and driving better customer conversion rates." Defendant Campion also said that "we have been passing or rolling through an improved process at Byte in relation to customer acquisition, ensuring that the customers that we are bringing into

18

the funnel are more likely than in the past to end up ordering aligners."

56.     On May 10, 2023, Defendant Campion attended a question-and-answer session with a Bank of America analyst during the Bank of America Securities Healthcare Conference. During this session, Defendant Campion said that Byte had a "really strong quarter, low 30% growth rate for Byte. Great conversion rate." He further stated that the Byte "funnel is smaller but it is a higher quality funnel, as a result of the ton of the work that the team in Salt Lake City has done. So our conversion rates have gone up." Defendant Campion also said that "the Byte Plus app has increased our net promoter score meaningfully over the past six months."

57.     On June 1, 2023, Dentsply executives attended Stifel's Jaws & Paws conference, where Defendant Campion stated that Byte had "streamlined how we run businesses in the sense of we have a more focused funnel." He added, "[w]e validate customers as they enter the funnel. So we don't spend money sending an impression kit to a customer who is not likely to actually purchase. We've changed incentive plans."

58.     On August 3, 2023, Dentsply conducted its earnings call for the second quarter of 2023. During the call, Defendant Coleman stated that "Byte grew high-single digits, driven by improved customer conversion rates and lower customer acquisition costs." Defendant Campion added, "Byte continues to deliver top line growth and enhanced operational performance with higher customer conversion rates, effective patient engagement and lower customer acquisition costs."

59.     On November 9, 2023, Dentsply held a virtual "Investor Day" for analysts and investors. During this call, Defendant Campion averred that Dentsply was "investing in the patient experience with our SureSmile and Byte aligners." Defendant Frank said that the "Byte business has changed its marketing strategy to focus on specific target demographics, which has resulted in

19

more than 20% higher customer conversion rates year-to-date versus last year." Defendant Coleman then explained that a customer conversion occurs when "you send an impression kit to a customer [and] you get it back and actually convert it to a sale." He added, "[t]hat percent going up is a big deal from a revenue perspective, but also a profitability perspective because it drives cost of customer acquisition way down. So that's one thing and we've seen a really nice improvement." Defendant Frank then further stated that adoption of the Byte app led to "a significant improvement in Net Promoter Scores at the point of treatment completion."

60.     On February 29, 2024, Dentsply filed an annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Campion, Coleman, Lucier, Brandt, Deese, Gladden, Holden, Hosein, Mazelsky, Varon, Vergis, and Wenzel. Appended to the 2023 10-K were SOX certifications, signed by Defendants Campion and Coleman, attesting to the accuracy of the financial statements contained therein.

61.     The 2023 10-K reiterated that Byte "contracts with an expansive nationwide network of independent licensed dentists and orthodontists for the provision of clinical services, including the oversight and control of each customer's clinical treatment in order to comply with these regulations and ensure that the business does not violate rules pertaining to the corporate practice of dentistry."

62.     The statements detailed above were materially false and misleading when made because they failed to disclose materially adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, among other things, that: (i) Byte aligners had been causing major injuries since at least May 2021, as revealed in backlogged injury reports that the Company filed with the FDA over the course of 2024; (ii) these

injuries occurred partially because Dentsply incentivized customer service employees and overseeing dentists to enroll contraindicated patients, who had other dental issues that should have rendered them ineligible for Byte treatment; (iii) due to the foregoing, the Individual Defendants' positive statements regarding Byte's customer experience and expansive network of dentists overseeing and controlling each customer's treatment were misleading and/or lacked a reasonable basis; and (iv) Dentsply concealed the fact that its high conversion rates were due to sales incentives to enroll contraindicated patients.

***The Truth Emerges***

63.     On October 24, 2024, Dentsply filed a current report on Form 8-K with the SEC, attached to which was a press release (the "October 2024 Press Release"). The October 2024 Press Release stated that, in a decision "made in consultation with the FDA," Dentsply was suspending the sale and marketing of the Byte Aligner System and Impression Kits. The Company also stated that it "expects to record non-cash charges for the impairment of goodwill within the range of $450 -$550 million."

64.     The next day, Dentsply conducted a conference call (the "October 25 Conference Call") with analysts and investors to discuss the Byte business update. During that call, Defendant Campion explained the Company's decision to withdraw Byte aligners from the market, stating that "in connection with our ongoing discussions with FDA, we have determined that our patient onboarding workflow may not provide adequate assurance that certain. . . contraindicated patients do not enter treatment with Byte Aligners." Defendant Campion also stated, "[f]rom a macro perspective, the state regulatory environment has adversely impacted our Byte Aligner business model. As a result, we've seen declining conversion rates and new documentation records and additional requirements, such as evidence of visits to a dentist or patient x-rays."

65.     Although Dentsply disclosed this information, it concealed the true severity of the situation. For example, in the October 2024 Press Release, Dentsply described the suspension of sales and marketing of Byte Aligners as a "precautionary measure" that would only last "while the Company conducts a review of certain regulatory requirements." Then, on the October 25 Conference Call, Defendant Campion stated that "Dentsply Sirona holds itself to the highest standards of quality and compliance with patient safety at the center of everything we do" and that "[c]onsistent with that commitment, we have proactively taken steps to continuously improve our post-market surveillance processes. One way, we do this is through the company's operating model, which includes retrospective analysis and reporting."

66.     Analysts reacted negatively to the news of the sales and marketing suspension. However, the Individual Defendants' misleading assurances lessened the impact of the disclosures. For example, an analyst at Leerink Partners wrote, "[i]t is never a 'good' news day when a company has to pull a product from the market. But in the grand scheme of potential events for XRAY, we think that the overall dynamic of today's Byte news and generally decent pre-announcement (vs. very low expectations) isn't necessarily terrible."

67.     As a result of the foregoing disclosures, the price of Dentsply's common stock dropped $1.10 per share, or 4.5%, from a closing price of $24.41 per share on October 24, 2024, to a closing price of $23.31 per share on October 25, 2024.

68.     On November 7, 2024, Dentsply reported its financial results for the first quarter of 2024. The Company announced a revised outlook for 2024 of "adjusted EPS of $1.82 to $1.86 (previously $1.96 to $2.02)" and an "impairment of goodwill of ($495) million net of tax" to the Orthodontic and Implant Solutions segment, which includes Byte. Dentsply explained that it was revising its 2024 outlook "due to market pressures impacting U.S. equipment, legislative changes

22

affecting the direct-to-consumer aligner business model, and the voluntary suspension of sales, marketing and shipments of Byte Aligners and Impression Kits." The Company explained that "[t]he outlook does not include potential adjustments or impacts of additional Byte remediation measures or decisions made by the Company."

69.    Dentsply held an earnings call later that day, during which the Individual Defendants further discussed the third quarter results. Defendant Campion explained that even before the suspension of sales, "[r]educed conversion rates for Byte drove a sequential double-digit decline." Defendant Coleman said that "Byte, our direct-to-consumer aligner brand, declined 7% year-over-year and 19% sequentially, primarily due to lower conversion rates and other adverse impacts from legislative challenges in certain states." Defendant Campion also cast doubt on Dentsply's long-term prospects, stating "I think the obvious question many of you will have surrounds our original $3 adjusted EPS target for 2026. Clearly, the macro and other pressures, like Byte, have created significant hurdles to achieving this target."

70.    Defendant Campion also informed investors that Byte faced an uncertain future, stating that the Company was "not at a point in our analysis to make a definitive decision concerning Byte and we are thoroughly evaluating strategic options, which may include a discontinuation of some or all of [this] business." In response to a question regarding how long the suspension might last, Defendant Campion responded that the Company had "taken very fast action on the cost side" and "informed the . . . relevant employees that their jobs will be ceasing to exist." Later in the call, an analyst asked if Defendant Campion's response meant that Byte Aligners would be permanently off the market, stating "I mean, effectively, it sounds like you're telling use you're just shutting down the business without just saying you're shutting down the business."

71.    The market was shocked by this news. "Tough day," wrote an analyst for Evercore ISI. The analyst continued, "[t]oday's update to both shorter-term dynamics in the channel and the 2025 financial implications from the Byte suspension (which we are assuming will be permanent), have complicated the outlook for XRAY." An analyst from Leerink Partners wrote that "[u]nknowns [are] piling up" and that Leerink's "previous view had been that the company has numerous levers to sustain profit growth. With ongoing growth challenges, the Byte suspension (we have removed Byte from our model for now), and what remains a choppy market, we find it hard to remain constructive until we see better data points." An analyst for Piper Sandler wrote that the day's news regarding Dentsply had analysts wondering, "'is this the bottom?' or 'will it get worse?'"

72.    As a result of these disclosures, the price of Dentsply common stock dropped $6.72 per share, or more than 28%, from a closing price of $23.98 per share on November 6, 2024, to a closing price of $17.26 per share on November 7, 2024.

## THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO ISSUE FALSE AND MISLEADING PROXY STATEMENTS

73.    In addition to false and misleading statements discussed above, the Individual Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period. On April 14, 2023, the Company filed a proxy statement on Schedule 14A with the SEC (the "2023 Proxy Statement"), that sought stockholder votes to, among other things, elect Defendants Campion, Deese, Holden, Hosein, Lucier, Mazelsky, Varon, Vergis, Wenzel, Kraemer, and Brandt to the Board.

74.    The 2023 Proxy Statement states the following regarding risk oversight:

The Board oversees the management of risks inherent in the operation of our businesses and the implementation of our strategic plan. In this regard, the Board

24

seeks to understand and oversee the most critical risks relating to the Company's business, allocate responsibilities for the oversight of risks among the full Board and its committees, and see that management has in place effective systems and processes for managing risks facing the Company. Risks falling within this area include but are not limited to general business and industry risks, operating risks, business continuity risks, ESG risks, cyber-security risks, financial risks including infrastructure, talent management and human capital and workforce related risks and compliance and regulatory risks. Overseeing risk is an ongoing process and is inherently tied to our operations and overall strategy. Accordingly, the Board considers risk throughout the year and with respect to specific proposed actions. While the Board oversees risk, our management is charged with identifying and managing risk. The Company has robust internal processes to identify and manage risks and to communicate information about risk to the Board. Risk management is not allocated to a single risk management officer within the Company, but rather is administered by management in an approach that is designed to ensure that the most significant risks to the Company, on a consolidated basis, are being managed and monitored appropriately. This process includes:

- identifying the material risks that the Company may face;
- establishing and assessing processes for managing those risks;
- determining the Company's risk appetite and mitigation strategies and responsibilities; and
- making regular reports to the Board on management's assessment of exposure to risk and steps management has taken to monitor and manage such exposure.

The Board implements its risk oversight function both as a whole and through delegation to the Board committees. Specifically, the Audit and Finance Committee, pursuant to its charter, regularly assesses and discusses with management the Company's major enterprise risk exposures and the steps that have been taken to monitor and control such exposures. The Audit and Finance Committee and the other committees meet regularly and report back to the full Board. The Corporate Governance and Nominating Committee is responsible for overseeing management of risks related to our environmental and governance practices, and coordinates with the Human Resources Committee on overseeing management of risks related to our social practices. The full Board regularly reviews reports from management on various aspects of our business, including related risks and tactics and strategies for addressing them. At least annually, the Board reviews our Chief Executive Officer succession planning. In performing these functions, each committee has full access to management, as well as the ability to engage advisors. See "The Board of Directors and its Committees" above for more information regarding the roles and responsibilities of the Board committees.

The Board and the Audit and Finance Committee, pursuant to its Charter, oversee

the Company's management of cybersecurity risk. The Audit and Finance Committee regularly briefs the full Board on these matters, and the full Board and the Audit and Finance Committee receive updates multiple times throughout the year and ad-hoc briefings from the Chief Information Officer on the Company's cybersecurity program, including information about cyber risk management governance and the status of projects to strengthen cybersecurity controls.

Also, the Company's leadership structure, discussed in "Leadership Structure of the Board of Directors" above, supports the risk oversight function of the Board. In addition, independent directors chair the Board committees involved with risk oversight and there is open communication between senior management and directors.

75. The 2023 Proxy Statement also stated the following regarding the Company's Code of Conduct:

We have adopted a Code of Ethics and Business Conduct that applies to all of our directors, executive officers, and employees. A copy of the Code of Ethics is available at the "Company — Investors — Governance — Documents & Charters" section of our website at www.dentsplysirona.com.

76. The 2024 Proxy Statement, filed on April 10 2024, recommended that shareholders vote, among other things, to elect Defendants Campion, Deese, Gladden, Holden, Hosein, Lucier, Mazelsky, Varon, Vergis, and Wenzel to serve one-year terms on the Board.

77. The 2024 Proxy Statement contained nearly identical provisions to the 2023 Proxy Statement regarding risk oversight and the Audit Committee's role in risk assessment and risk management.

78. Defendants Campion, Deese, Gladden, Holden, Hosein, Lucier, Mazelsky, Varon, Vergis, Wenzel, Kraemer, and Brandt (the "Proxy Defendants") caused the 2023 and 2024 Proxy Statements to be false and misleading by failing to disclose that the risk oversight functions of the Board and its committees were not being performed as described, which resulted in the Company making materially false and misleading statements concerning Byte's customer experience, the network of dentists overseeing and managing each customer's treatment, and the impact of sales

26

incentives on conversion rates.

79.     As a result of these misleading statements, the Company's stockholders made an uninformed decision when voting to reelect the above defendants.

## **REPURCHASES DURING THE RELEVANT PERIOD**

80.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $551.4 million to repurchase approximately 18.2 million shares of its own common stock at artificially inflated prices from March 2023 through September 2024.

81.     According to the quarterly report filed on Form 10-Q for the first quarter of 2023, between March 1, 2023 and March 31, 2023, the Company repurchased approximately 3,100,000 shares of its own common stock at an average price per share of approximately $38.74, for a total cost to the Company of approximately $120,094,000.

82.     As the Company's stock was actually worth only $17.26 per share, the price at closing when the truth emerged on November 7, 2024, the Company overpaid by approximately $66,588,000 for repurchases of its own stock between March 1, 2023 and March 31, 2023.

83.     According to the quarterly report filed on Form 10-Q for the second quarter of 2023, between April 1, 2023 and April 30, 2023, the Company repurchased approximately 800,000 shares of its own common stock at an average price per share of approximately $37.82, for a total cost to the Company of approximately $30,256,000.

84.     As the Company's stock was actually worth only $17.26 per share, the price at closing when the truth emerged on November 7, 2024, the Company overpaid by approximately $16,448,000 for repurchases of its own stock between April 1, 2023 and April 30, 2023.

27

85.     According to the annual report filed on Form 10-K for 2023, between November 1, 2023 and November 30, 2023, the Company repurchased approximately 3,100,000 shares of its own common stock at an average price per share of approximately $29.91, for a total cost to the Company of approximately $92,721,000.

86.     As the Company's stock was actually worth only $17.26 per share, the price at closing when the truth emerged on November 7, 2024, the Company overpaid by approximately $39,215,000 for repurchases of its own stock between November 1, 2023 and November 30, 2023.

87.     According to the annual report filed on Form 10-K for 2023, between December 1, 2023 and December 31, 2023, the Company repurchased approximately 1,800,000 shares of its own common stock at an average price per share of approximately $32.15, for a total cost to the Company of approximately $57,870,000.

88.     As the Company's stock was actually worth only $17.26 per share, the price at closing when the truth emerged on November 7, 2024, the Company overpaid by approximately $26,802,000 for repurchases of its own stock between December 1, 2023 and December 31, 2023.

89.     According to the quarterly report filed on Form 10-Q for the second quarter of 2024, between May 1, 2024 and May 31, 2024, the Company repurchased approximately 3,500,000 shares of its own common stock at an average price per share of approximately $27.98, for a total cost to the Company of approximately $97,930,000.

90.     As the Company's stock was actually worth only $17.26 per share, the price at closing when the truth emerged on November 7, 2024, the Company overpaid by approximately $37,520,000 for repurchases of its own stock between May 1, 2024 and May 31, 2024.

91.      According to the quarterly report filed on Form 10-Q for the second quarter of 2024, between June 1, 2024 and June 30, 2024, the Company repurchased approximately

28

1,900,000 shares of its own common stock at an average price per share of approximately $27.60, for a total cost to the Company of approximately $52,440,000.

92.     As the Company's stock was actually worth only $17.26 per share, the price at closing when the truth emerged on November 7, 2024, the Company overpaid by approximately $19,646,000 for repurchases of its own stock between June 1, 2024 and June 30, 2024.

93.     According to the quarterly report filed on Form 10-Q for the third quarter of 2024, between August 1, 2024 and August 31, 2024, the Company repurchased approximately 3,000,000 shares of its own common stock at an average price per share of approximately $24.91, for a total cost to the Company of approximately $74,730,000.

94.     As the Company's stock was actually worth only $17.26 per share, the price at closing when the truth emerged on November 7, 2024, the Company overpaid by approximately $22,950,000 for repurchases of its own stock between August 1, 2024 and August 31, 2024.

95.      According to the quarterly report filed on Form 10-Q for the third quarter of 2024, between September 1, 2024 and September 30, 2024, the Company repurchased approximately 1,000,000 shares of its own common stock at an average price per share of approximately $25.38, for a total cost to the Company of approximately $25,380,000.

96.     As the Company's stock was actually worth only $17.26 per share, the price at closing when the truth emerged on November 7, 2024, the Company overpaid by approximately $8,120,000 for repurchases of its own stock between September 1, 2024 and September 30, 2024. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $237.3 million.

## **DAMAGES TO DENTSPLY**

97.     As a direct and proximate result of the Individual Defendants' misconduct,

29

Dentsply has expended and will continue to expend significant sums of money.

98.     Such expenditures include, but are not limited to, legal fees, costs, and amounts paid to outside lawyers, accountants, experts, and investigators in the Securities Class Action.

99.     Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

100.    As a direct and proximate result of the Individual Defendants' conduct, Dentsply has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

101.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

102.    Dentsply is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

103.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

104.    Plaintiff is an owner of Dentsply stock and has been a continuous holder of the Company's common shares at all relevant times.

105.    A pre-suit demand on the Board is futile and therefore, excused. At the time this

suit was filed, the Board consisted of the following individuals: Defendants Deese, Gladden, Holden, Hosein, Lucier, Mazelsky, Varon, and Vergis (the "Director Defendants"). The Board also consisted of non-party directors Barber, Scavilla, and Zurbay. Plaintiff is required to show that a majority of directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, none of the Board's current directors are capable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

106. Each of the Director Defendants faces a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

107. The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

31

108. The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

**A. Defendants Gladden, Hosein, Varon, and Wenzel are Not Disinterested Because They Were Members of the Audit and Finance Committee.**

109. Defendants Gladden, Hosein, Varon, and Wenzel either serve, or have served during the Relevant Period, as members of the Audit and Finance Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent or correct the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices as alleged above. Therefore, Defendants Gladden, Hosein, Varon, and Wenzel cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

**B. The Director Defendants are Not Independent.**

110. The Director Defendants received, and most continue to receive substantial compensation for their roles as Company directors. In addition, Defendants Deese, Gladden, Holden, Hosein, Lucier, Mazelsky, Varon, and Vergis solicited the false and misleading 2024 Proxy Statement, which led to their reelection to the Board, allowing them to continue breaching their fiduciary duties to the Company. As trusted Company directors, they conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in

32

the scheme, and consciously disregarded their duties to protect corporate assets. For these reasons, Defendants Deese, Gladden, Holden, Hosein, Lucier, Mazelsky, Varon, and Vergis breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

111.     Furthermore, The Director Defendants signed the 2022 10-K and 2023 10-K and solicited the 2023 and 2024 Proxy Statements each of which contained false and misleading statements. As trusted Company directors, the conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded their duties to protect corporate assets. For these reasons, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested and, thus, demand upon them is futile and, therefore, excused.

112.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

113.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face

33

a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

114.    The Director Defendants may be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Dentsply. If there is a liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Dentsply, there would be no insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

115.    If there is no liability insurance, then the Director Defendants will not cause Dentsply to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

116.    Accordingly, for all the reasons set forth above, a majority of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT ONE

**Against the Proxy Defendants for Violations of Section 14(a) of the Exchange Act**

117.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

118.     The Proxy Defendants solicited the 2023 and 2024 Proxy Statements containing materially false and misleading statements and/or omissions.

119.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

120.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

121.     The 2023 and 2024 Proxy Statements failed to disclose that (i) Byte aligners had been causing major injuries since at least May 2021, as revealed in backlogged injury reports that the Company filed with the FDA over the course of 2024; (ii) these injuries occurred partially due to Dentsply incentivized customer service employees and overseeing dentists to enroll contraindicated patients, who had other dental issues that should have rendered them ineligible for

35

Byte treatment; (iii) due to the foregoing, the Individual Defendants' positive statements regarding Byte's customer experience and expansive network of dentists overseeing and controlling each customer's treatment were misleading and/or lacked a reasonable basis; (iv) Dentsply concealed the fact that its high conversion rates were due to sales incentives to enroll contraindicated patients; and (v) Dentsply lacked proper disclosure controls.

122. In exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination.

123. The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the 2023 and 2024 Proxy Statements.

124. Plaintiff on behalf of Dentsply has no adequate remedy at law.

## **<u>COUNT TWO</u>**

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

125. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

126. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Dentsply. Not only is Dentsply now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in the Securities Class Action, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Dentsply by the Individual Defendants. With the price of its common stock trading at

36

artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Dentsply.

127.     During the Relevant Period, the Individual Defendants caused the company to overpay by approximately $237.3 million to repurchase roughly 18.2 million shares.

128.      During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

129.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Dentsply not misleading.

130.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Dentsply.

131.      The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

132. In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

133. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

134. Plaintiff on behalf of Dentsply has no adequate remedy at law.

## COUNT THREE

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act 15 U.S.C. § 78t(a))

135. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase Dentsply stock at prices artificially inflated by those materially false and misleading statements.

38

137.     Plaintiff, on behalf of Dentsply, has no adequate remedy at law.

## COUNT FOUR

### Against the Individual Defendants for Breach of Fiduciary Duties

138.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

139.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Dentsply's business and affairs.

140.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

141.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Dentsply.

142.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

143.     In further breach of their fiduciary duties owed to Dentsply, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (i) Byte aligners had been causing major injuries since at least May 2021, as revealed in backlogged injury reports that the Company filed with the FDA over the course of 2024; (ii) these injuries occurred partially due to Dentsply incentivized customer service employees and overseeing dentists to enroll contraindicated patients, who had other dental issues that should have rendered them ineligible for Byte treatment; (iii) due to the foregoing, the Individual Defendants' positive statements regarding

39

Byte's customer experience and expansive network of dentists overseeing and controlling each customer's treatment were misleading and/or lacked a reasonable basis; and (iv) Dentsply concealed the fact that its high conversion rates were due to sales incentives to enroll contraindicated patients.

144. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

145. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

146. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed

40

knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

147. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

148. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Dentsply has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

149. Plaintiff on behalf of Dentsply has no adequate remedy at law.

## COUNT FIVE

### Against the Individual Defendants for Unjust Enrichment

150. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

151. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Dentsply.

152. The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Dentsply that was tied to the performance or artificially-inflated valuation of Dentsply or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

153. Plaintiff, as a shareholder and a representative of Dentsply, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including

from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

154. Plaintiff on behalf of Dentsply has no adequate remedy at law.

## COUNT SIX

### Against the Individual Defendants for Waste of Corporate Assets

155. Plaintiff incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

156. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

157. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (1) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, *supra*; (2) awarding self-interested stock options to certain officers and directors; and (3) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

158. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

159. Plaintiff, on behalf Dentsply, has no adequate remedy at law.

## COUNT SEVEN

### Against the Individual Defendants for Gross Mismanagement

160. Plaintiff incorporates by reference and re-allege each allegation contained above,

42

as though fully set forth herein.

161.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

162.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

163.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

<u>**REQUEST FOR RELIEF**</u>

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants, jointly and severally, and in favor of the Company, all losses and damages sustained by the Company as a result of the acts and transactions complained of herein, together with pre-judgment interest, in a fashion that ensures the Individual Defendants do not participate therein or benefit thereby;

C.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

D.    Directing the Company to take all necessary actions to reform and improve its

43

corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

      E.      Awarding punitive damages;

      F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 24, 2026

**HAUSLER LAW FIRM, PLLC**

*/s/ Kurt F. Hausler*
Kurt F. Hausler
NC Bar No.: 22103
524 East Boulevard
Charlotte, NC 28203
Telephone: (704) 247-3255
Fax: (704) 247-3267
Email: khausler@hauslerlaw.com

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*

44

## **<u>VERIFICATION</u>**

I, Derrick Chua am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

2/13/2026

*Derrick Chua*
B7BB81278C26402...
Derrick Chua